STERILITE CORPORATION vs. CONTINENTAL CASUALTY
COMPANY.

Suffolk.   October 6, 1983. — December 28, 1983.

Present: GRANT, KAPLAN, & KASS, JJ.

*Insurance*, Defense of proceeding against insured, Products liability insur-
ance, Construction of policy. *Attorney at Law*, Compensation.

Certain allegations in a third-party complaint against a manufacturing
corporation stated a sufficient claim under the property damage provi-
sions of the corporation's policy of products liability insurance to in-
voke the insurer's duty to defend the third-party action, and did not
come within the policy's "business risk" exclusion. [318-323]
An insurer's mere denial of coverage, without an appropriate demonstra-
tion that a certain claim did not, on its facts, comprise matters covered
by a policy of insurance it had issued, would not relieve the insurer
from its duty to defend its insured against a liability apparently within
the effective coverage of the policy. [323-324]
No error appeared in the procedure establishing the amount of attorney's
fees which an insurance company was to reimburse to its insured for
defense of a products liability claim. [324-325]

CIVIL ACTION commenced in the Superior Court Depart-
ment on October 20, 1980.

The case was heard by *Paquet*, J., on a motion for sum-
mary judgment.

*Terrance J. Hamilton* for the defendant.

*Stephen H. Oleskey* (*Lisa G. Arrowood* with him) for the
plaintiff.

KAPLAN, J.   Sterilite Corporation (Sterilite), a manufac-
turer of molded plastics, was the insured under a so-called
"comprehensive general liability policy," issued by Conti-
nental Casualty Company (Continental).[1]   This provided

[1] Sterilite had also purchased an "excess umbrella third party liability
policy" which served to increase the dollar limit of coverage under the

protection against certain forms of products liability. In the present suit Sterilite sought a declaration that Continental was obliged to undertake its defense in a third-party action in which it was named as a defendant.

More particularly: Henry Heide, Inc. (Heide), purchased from WRH Products Co., Inc. (WRH), for a price of about $100,000, some 23,130 plastic "starch trays," i.e., trays carrying starch, to be used in the process of candy manufacture. On July 21, 1975, Heide commenced an action in Federal court against WRH, as seller; Sterilite, as manufacturer of the trays; and Dow Chemical Company, as supplier of material entering into the composition of the trays, claiming damages of not less than $600,000 for property damages arising from alleged defects in the trays.[2] Notified by Sterilite of the pending action, Continental provisionally assumed the defense on Sterilite's behalf, then on August 21, 1975, disclaimed responsibility with regard to any damage to the trays,[3] and subsequently, on January 5, 1976, disclaimed all responsibility. Accordingly, Sterilite started to defend itself in Heide's action by engaging and compensating counsel of its own choice.

On October 20, 1980, with the Heide action still pending, Sterilite brought the present declaratory suit. The parties cross-moved for summary judgment. A judge of the Supe-

"comprehensive" policy but did not itself impose a duty on the part of the insurer to defend third-party actions. Thus we concentrate on the terms of the "comprehensive" policy which did so obligate the insurer. The dollar limit, as raised, was $1.3 million, and the annual premium payable on both policies was about $15,000; the policies ran from 1973 to 1976.

See generally on the "comprehensive" policy Tinker, Comprehensive General Liability Insurance — Perspective and Overview, 25 Fed'n Ins. Couns. Q. 217 (1975). See also Henderson, Insurance Protection for Products Liability and Completed Operations — What Every Lawyer Should Know, 50 Neb. L. Rev. 415, 416-425 (1971).

[2] Heide initially filed its action in the United States District Court for the Southern District of New York, but, as there was doubt about jurisdiction, it later, on December 1, 1975, filed another virtually identical action in the District Court for New Jersey. Eventually the first action was dismissed and litigation on the merits went forward in the second.

[3] See the discussion of exclusion (n) of the policy, note 10, *infra*.

rior Court, holding for Sterilite, declared that Continental was in breach of its duty to defend the Heide action on behalf of Sterilite, that it was liable for the counsel fees and related expenses already incurred by Sterilite to the time of judgment (fixed at $108,370.74), and was obligated for the future either to undertake the defense itself or to reimburse Sterilite the further expenses of suit. Continental appeals. We modify the disposition in one particular.

1. It is settled in this jurisdiction, and generally elsewhere, that the question of the initial duty of a liability insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions: if the allegations of the complaint are "reasonably susceptible" of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must undertake the defense. See *Vappi & Co., Inc.* v. *Aetna Cas. & Sur. Co.*, 348 Mass. 427, 431 (1965); *Magoun* v. *Liberty Mut. Ins. Co.*, 346 Mass. 677, 681-682 (1964); *Terrio* v. *McDonough*, 16 Mass. App. Ct. 163, 166 (1983). See also 7C Appleman, Insurance Law and Practice § 4683 (rev. ed. 1979); 14 Rhodes, Couch's Cyclopedia of Insurance Law § 51.42 (2d ed. rev. 1982); 1 Long, Law of Liability Insurance § 5.03 (1981); Windt, Insurance Claims and Disputes § 4.01 (1982); Annot., 50 A.L.R. 2d 458 (1956).[4] Otherwise stated, the process is one of envisaging what kinds of losses may be proved as lying within the range of the allegations of the complaint, and then seeing whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy. See *Gray* v. *Zurich Ins. Co.*, 65 Cal.2d 263, 274-277 (1966). See also *Baybutt Constr. Corp.* v. *Commercial Union Ins. Co.*, 455

---

[4] Under the policy, Continental had the "duty to defend any suit against the insured seeking damages on account of such . . . property damage ['property damage to which this insurance applies'], even if any of the allegations of the suit are groundless, false or fraudulent . . ." This obligation was distinct from and of broader scope than the further obligation to indemnify the insured against judgments obtained against it within the policy coverage. See *Spoor-Lasher Co.* v. *Aetna Cas. & Sur. Co.*, 39 N.Y.2d 875, 876-877 (1976).

A.2d 914, 921-922 (Me. 1983). Cf. *Green Bus Lines* v. *Consolidated Mut. Ins. Co.*, 74 A.D.2d 136, 144, appeal denied, 52 N.Y.2d 701 (1980). Upon such analysis, we agree with the trial judge that there was enough in the Heide complaint to invoke the duty of the insurer to defend under the policy provisions.[5]

The Heide complaint alleged the following: The defendants knew the particular purposes of Heide's candy manufacturing process for which the starch trays were intended; the defendants were in breach of express and implied warranties, since the trays were unfit for their intended use, were of unmerchantable quality, and did not conform to sample; moreover, the defendants were negligent in the design, manufacture, and testing of the trays. As a result, Heide "has incurred losses and suffered damages including, among other things, lost sales and profits, increased costs of obtaining replacement trays, loss of reasonable return on its capital investment in manufacturing equipment and costs of storage and handling." The complaint is an instance, although not an extreme instance, of the general or "notice" style of averment of the Federal Rules, and is not to be read with the literalness or narrowness associated with the name of the late Baron Parke.[6] "In order for the duty of defense to arise, the underlying complaint need only show, through general allegations, a possibility that the liability claim falls within the insurance coverage. There is no requirement that the facts alleged in the complaint specifically and unequivocally make out a claim within the coverage." *Union*

---

[5] For purposes of the present case, we need not explore those decisions which, even where the complaint itself would not cast on the insurer a duty to defend, oblige the insurer to defend if it knows or could readily ascertain facts that implicate such a duty. See the references in *Terrio* v. *McDonough,* 16 Mass. App. Ct. 163, 167 (1983); also *Milliken* v. *Fid. & Cas. Co.,* 338 F.2d 35, 40 (10th Cir. 1964); 14 Rhodes, *supra* at § 51.45; 7C Appleman, *supra* at § 4684.01; 1 Long, *supra* at § 5.09; Windt, *supra* at § 4.03. Compare note 17, *infra.*

[6] Judge L. Hand early noted the possible effects on the insurer's duty of "the plasticity of modern pleading." *Lee* v. *Aetna Cas. & Sur. Co.,* 178 F.2d 750, 752 (2d Cir. 1949). There is elaboration and analysis of this point in *Terrio* v. *McDonough,* 16 Mass. App. Ct. 163, 165-169 (1983).

*Mut. Fire Ins. Co.* v. *Topsham*, 441 A.2d 1012, 1015 (Me. 1982). See also *Gray* v. *Zurich Ins. Co.*, *supra* at 276-277; *International Paper Co.* v. *Continental Cas. Co.*, 35 N.Y.2d 322, 325 (1974). Even if a measure of literalness is insisted upon, the reference in Heide's complaint to loss of return on investment in manufacturing equipment would, in our opinion, embrace and admit proof of physical impairment of such equipment causally related to the failure of the trays that were conveyed and handled in the manufacturing process.[7] And this item of loss fell within the "coverage" of the policy, specifically, the coverage of the part of the policy definition of "property damage" that speaks of "physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom." The reference in the complaint to costs of replacing trays ought to be enough to allow proof of physical damage of the trays, and we think it would be no impermissible inflation of the complaint to extend this to any damage to the contents of the trays, although the trial judge did not go so far.

Next, the complaint by the same reference to return on investment in manufacturing equipment would invite proof of causally connected loss of use of the equipment apart from any physical impairment thereof. This item of loss was covered by the further part of the policy definition of "property damage" which mentions "loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period."[8]

---

[7] The equipment is spoken of as a "mogul," possibly using that term in a sense derived from a dictionary meaning of a mogul as a locomotive used for hauling heavy trains.

[8] Such a case as *Hamilton Die Cast, Inc.* v. *United States Fid. & Guar. Co.*, 508 F.2d 417, 419-420 (7th Cir. 1975), cited by Continental, turning on "property damage," requires discriminating reading because the term was defined differently in the policy there at bar. A more-or-less standardized form of 1966 was succeeded by a form of 1973. Tinker, *supra* at 218, 232-235; 1 Long, *supra* at §§ 11.01, 11.10. See *Guerin Contractors, Inc.* v. *Bituminous Cas. Co.*, 5 Ark. App. 229, 236 (1982) (recognizing the increased breadth of the definition of "property damage" introduced in the more recent form of policy).

(There is no dispute that there was an "occurrence," as defined.)[9]

So much for the stated coverage. Now we go to the "exclusions." By exclusion (n), "This insurance does not apply: . . . (n) to property damage to the named insured's products arising out of such products or any part of such products." This means that the loss of the trays is withdrawn from coverage. The exclusion appears not to speak to the other items above mentioned.[10]

An exclusion, often called a "business risk" exclusion, appears in (m), as follows: "This insurance does not apply: . . . (m) to loss of use of tangible property which has not been physically injured or destroyed resulting from . . . (2) the failure of the named insured's products . . . to meet the level of performance, quality, fitness or durability warranted or represented by the named insured; but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the named insured's products . . . after such products . . . have been put to use by any person or organization other than the insured."[11] The language up to the word "but" removes from coverage standard situations where loss of use of equipment occurs simply by the failure

---

[9] "Occurrence" was defined in the policy as "an accident, including continuous or repeated exposure to conditions, which results in . . . property damage neither expected nor intended from the standpoint of the insured."

[10] This reading is supported by *Honeycomb Syss. Inc.* v. *Admiral Ins. Co.*, 567 F. Supp. 1400, 1408 (D. Me. 1983). Any broader interpretation of exclusion (n) encounters serious linguistic difficulties, and, in our view, cannot in any event extend to loss of use of manufacturing equipment as distinguished from the trays proper. Here we should recall that "[e]xclusions from coverage are to be strictly construed" and "[a]ny ambiguity in the somewhat complicated exclusions must be construed against the insurer." *Vappi & Co.* v. *Aetna Cas. & Sur. Co.*, 348 Mass. 427, 431 (1965).

[11] There is room for some possible doubt about the meaning of the words "other tangible property" but Continental's argument suggests to us, probably correctly, that the reference is to tangible property other than "the named insured's products," words appearing later in the quoted text. See *Todd Shipyards Corp.* v. *Turbine Servs., Inc.*, 674 F.2d 401, 418-419 (5th Cir. 1982).

of the insured's products to come up to the contract level.[12] It is understandable that the policy should not serve as a guaranty of the quality and suitability of the insured's products: these risks are of a kind that the insured may be expected to bear itself — and load into the prices of its products.[13] The "but" language of the (m) exclusion, however, removes from the business risk exclusion and retains coverage for instances where there is loss of use of tangible property, e.g., equipment, occasioned by "sudden and accidental" damage to the insured's products (even though, we interpolate, this damage may be related to inadequacies of the insured's products). The effect of (m) is to distinguish "between a physical breakdown of the insured's product and a mere failure of the product to perform as well as warranted, presumably because the latter is a typical business risk whereas the former is more likely to have catastrophic consequences." *Honeycomb Syss., Inc.* v. *Admiral Ins. Co.*, 567 F. Supp. 1400, 1407 (D. Me. 1983) (Gignoux, J.) (loss of use of paper manufacturing machine held covered, when insured's component product cracked, not merely failed to perform as warranted). The allegations of Heide's complaint seem to

---

[12] Sterilite has argued that all that is excluded is the warranty phase of Heide's claim, not the negligence phase. See the like suggestion in *Western Cas. & Sur. Co.* v. *Budrus*, 112 Wis.2d 348, 353-354 (Ct. App. 1983). See also *Willets Point Contracting Corp.* v. *Hartford Ins. Group*, 75 A.D.2d 254, 259 (1980), aff'd, 53 N.Y.2d 879 (1981). We need not rule on this matter.

[13] Tinker, *supra* at 224, describes such "business risks" as those "which management can and should control or reduce to manageable proportions; risks which management cannot effectively avoid because of the nature of the business operations; and risks which relate to the repair or replacement of faulty work or products. These risks are a normal, foreseeable and expected incident of doing business and should be reflected in the price of the product or service rather than as a cost of insurance to be shared by others." See also *Weedo* v. *Stone-E-Brick, Inc.*, 81 N.J. 233, 239-250 (1979).

It is understood that, to cover these risks, special forms of insurance may be available, at one time called "product failure" and latterly "product guarantee." See Product Guarantee Legal Liability Insurance, Fire Casualty & Surety Bulletins, Specialty Lines 1 (Nat'l Underwriters Co., May 1981); 17 John Liner Letter (no. 12), 7-8 (John Liner Insurance and Risk Management Advisors, Inc./John Liner Associates Nov. 1980).

us, as they evidently did to the trial judge, ample enough to harbor a "breakdown" situation, and they surely do not expressly bar it. Therefore the insurer's duty to defend attached. See *Carboline Co.* v. *Home Indem. Co.*, 522 F.2d 363, 367 (7th Cir. 1975); *C. Raymond Davis & Sons* v. *Liberty Mut. Ins. Co.*, 467 F. Supp. 17, 19 (E.D. Pa. 1979); *Spoor-Lasher Co.* v. *Aetna Cas. & Sur. Co.*, 39 N.Y.2d 875, 876 (1976).[14]

2. When, as in the present case, the allegations of the third-party complaint find apparent lodgment in the effective coverage of the policy, the insurer is obligated to defend. But it can, by certain steps, get clear of the duty from and after the time when it demonstrates with conclusive effect on the third party that as matter of fact — as distinguished from the appearances of the complaint and policy — the third party cannot establish a claim within the insurance. Judge L. Hand suggested that the demonstration of the precise basis on which the third-party action will proceed may be made by discovery or other tactics within the third-party action, whose defense will have been undertaken by the insurer. *Lee* v. *Aetna Cas. & Sur. Co.*, 178 F.2d 750, 752 (2d Cir. 1949).[15] An insurer may make the demonstration when brought into the third-party action upon impleader by the insured. See, e.g., *Terrio, supra,* 16 Mass. App. Ct. at 164. A declaratory action, in which the necessary interests are represented, may serve for the demonstration. See *Atlantic Mut. Fire Ins. Co.* v. *Cook,* 619 F.2d 553, 555 (5th Cir. 1980); *Firemen's Fund Ins. Co.* v. *Chasson,* 207 Cal. App.

---

[14] There is argument that loss of use of the manufacturing equipment falls under an exclusion (p), but it is enough to say that this interpretation would run counter to the accepted reading of the exclusion which confines it essentially to situations of withdrawal of a product because of a known defect in a "sister" product — hence (p) is called the "sistership" exclusion. See *Todd Shipyards Corp.* v. *Turbine Servs., Inc.,* 674 F.2d 401, 419 (5th Cir. 1982). No such situation is encountered here.

[15] The clarification may not come until the third-party action is fully tried, and in that case the duty to defend continues to the end, even if the result of the action is favorable to the insured and there is no judgment against the insured that the insurer needs to make good. *Lee, supra,* 178 F.2d at 752. See also *United States Fid. & Guar. Co.* v. *Louis A. Roser Co.,* 585 F.2d 932, 937 (8th Cir. 1978).

2d 801, 807 (1962).[16]  What is not permitted is that an insurer shall escape its duty to defend the insured against a liability arising on the face of the complaint and policy, by dint of its own assertion that there is no coverage in fact: the insurer then stands in breach of its duty even if the third party fails in the end to support any such claim of liability by adequate proof. See *Babcock & Wilcox Co.* v. *Parsons Corp.*, 430 F.2d 531, 538-539 (8th Cir. 1970).

Here, Continental flatly renounced coverage and liability without taking a demonstrative step, on the lines indicated, to establish that Heide's claim was in fact without coverage.[17]

3. Pursuant to a stipulation of the parties, Sterilite proved by affidavit with supporting ledger sheets the amounts incurred by it for attorneys' fees and related expenses over the seven years that the third-party claim had been in litigation. Upon that submission, Continental was entitled by the stipulation to request a hearing. It did not do so, and its opposition consisted, not in any attempted showing, anchored in the detailed needs of the litigation, that the amounts claimed were excessive, but in protestations that it could have con-

---

[16] *United States Fid. & Guar. Co.* v. *Louis A. Roser, supra* note 15, is an example of a declaratory action being tried in tandem with the third-party action.

[17] On the cross-motions in Sterilite's present action, Continental has relied essentially on its interpretation of Heide's complaint and the insurance policy. There was indication in some of Sterilite's "exhibits" submitted on the motions that the trays had buckled or deflected or sagged in use, with damage to the contents and jamming of other equipment, but the information was not particularized. As to whether even solid information reaching the insurer from the insured, and indicating that claimed losses were in fact uninsured, could itself relieve the insurer of its duty to defend, the *Lee* case says: "This language [requiring the insurer to defend even a baseless claim] means that the insurer will defend the suit, if the injured party states a claim, which, qua claim, is for an injury 'covered' by the policy; it is the claim which determines the insurer's duty to defend; and it is irrelevant that the insurer may get information from the insured, or anyone else, which indicates, or even demonstrates, that the injury is not in fact 'covered.'" 178 F.2d at 751. On this "irrelevance," see also *Clemmons* v. *Travelers Ins. Co.*, 88 Ill.2d 469, 476 (1981); *Green Bus Lines*, 74 A.D.2d at 144-145. But see *Rowell* v. *Hodges*, 434 F.2d 926, 929-930 (5th Cir. 1970); *American Motorists Ins. Co.* v. *Trane*, 544 F. Supp. 669, 688 (W.D. Wis. 1982).

ducted the defense of the third-party claim by counsel of its own selection at lower rates of compensation.[18] These general contentions are not impressive. The standard evidently applied by the judge was proper,[19] and his assessment of the facts was not "clearly erroneous." Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974).[20]

4. Besides ordering payment as indicated, the judgment appealed from declares, in substance, that Continental is obligated to defend on behalf of Sterilite or, alternatively, to reimburse Sterilite's expenses of defense. We think the judgment should be modified to declare, in effect, that Continental may absolve itself of the stated obligation from and after the time it makes an appropriate demonstration, as indicated in this opinion, that the third-party claim does not in fact comprise matters for which there is coverage.

*So ordered.*

---

[18] Continental asserted that too many lawyers were put to work on some parts of the defense of the Heide litigation but a supplemental affidavit on Sterilite's behalf tends to meet this criticism.

[19] See S.J.C. Rule 3:07, DR 2-106 (Fees for Legal Services), as appearing in 382 Mass. 772 (1981); *First Natl. Bank of Boston* v. *Brink,* 372 Mass. 257, 265 (1977). See also *Salem Realty Co.* v. *Matera,* 10 Mass. App. Ct. 571, 576 (1980), *S.C.,* 384 Mass. 803 (1981).

[20] Whether Continental could become responsible for Sterilite's expenses in prosecuting the present declaratory action, we need not discuss, for Sterilite abstains from pressing any such claim. See Annot., 87 A.L.R.3d 429, 441-449 (1978).