49 Mass. App. Ct. 651 (2000)                                    651

Dorchester Mutual Fire Insurance Company *v.* First Kostas Corporation, Inc.

DORCHESTER MUTUAL FIRE INSURANCE COMPANY *vs.* FIRST
KOSTAS CORPORATION, INC., & others.[1]

No. 98-P-1250.

Norfolk. April 11, 2000. - July 12, 2000.

Present: BROWN, GREENBERG, & GELINAS, JJ.

*Practice, Civil,* Declaratory proceeding. *Insurance,* Contractor's insurance,
Construction of policy, Insurer's obligation to defend, Property damage.

The express "impaired property" provision of a compréhensive general li-
ability policy operated to exclude a claim for loss of use of a house caused
by a house painting contractor's faulty workmanship that left the house as-
sertedly contaminated with lead paint chips and dust, and the insurer thus
was not obligated to defend against the claim. [653-655]
This court reiterated that a declaratory judgment action is an appropriate
vehicle for determination of a dispute over an insurer's duty to defend.
[653, 655-656]

CIVIL ACTION commenced in the Superior Court Department on
June 4, 1997.

The case was heard by *Ralph D. Gants,* J., on a motion for
summary judgment.

*Dimitrios Ioannidis* for First Kostas Corporation, Inc.

*Robert J. Doyle* for Carol Goss & another.

*Anna K. C. Bennett* for the plaintiff.

*Laura A. Foggan, Daniel E. Troy, & Alex M. Azar, II,* of the
District of Columbia, & *Rosanna Sattler,* for Insurance
Environmental Litigation Association, amicus curiae, submitted
a brief.

GREENBERG, J. Underlying this action is a paint job done on
the outside of Carol Goss's and Donald Straus's (owners) house,
during which lead paint chips and dust allegedly were propelled
inside by employees of First Kostas Corporation, Inc. (contrac-
tor). The contractor previously had purchased a comprehensive

---

[1]Carol Goss and Donald Straus.

general liability policy from Dorchester Mutual Fire Insurance Company (Dorchester), but Dorchester denied coverage. On February 7, 1997, the owners sent a G. L. c. 93A demand letter to the contractor claiming that the contractor's activities caused them to hire a hazardous waste clean-up company, vacate the premises, and conduct tests of family members (and pets) to check lead levels. Dorchester brought this action under G. L. c. 231A seeking a judgment declaring that the owners' claim is not within the scope of the policy and that Dorchester has no obligation to defend against the claim.

The question of coverage is raised by several policy exclusions that Dorchester argues disfavor the contractor.[2] Upon consideration of cross motions for summary judgment, a Superior Court judge rejected Dorchester's reliance on a pollution exclusion, but agreed that coverage was barred by Section (B)(1)(k)(5) of the policy, one of the so-called "faulty workmanship" clauses set out in the margin. He entered summary judgment in favor of Dorchester.

These are the uncontroverted, material facts. On October 8, 1996, the owners entered into a contract with the contractor to paint the exterior of their house. The contract specified that the old paint would be scraped off and sanded, and two new coats would be applied. Painters employed by the contractor undertook the preparation work and completed the painting to the owners' satisfaction. Nonetheless, the owners alleged that, in the process, lead paint chips and dust contaminated the inside of their premises. They claim that remediation of the resulting

---

[2]The policy contains at least three exclusions for property damage that potentially apply to claims resulting from faulty workmanship of the insured:

(1) Section B(1)(k)(5) excludes property damage to "[t]hat particular part of real property on which [the insured] is performing operations, if the 'property damage' arises out of those operations."

(2) Section B(1)(k)(6) excludes property damage to "[t]hat particular part of any property that must be restored, repaired or replaced because '[the insured's] work' was incorrectly performed on it."

(3) Section B(1)(n)(1) excludes property damage to " 'impaired property' or property that has not been physically injured, arising out of: . . . A defect, deficiency, inadequacy or dangerous condition in . . . '[the insured's] work.' "

property damage was necessary, and that they expended about $17,000 for that purpose.[3]

Dorchester investigated the claim and refused coverage under several different policy exclusions. To settle the matter, and prior to the owners bringing any damage suit, Dorchester initiated this declaratory judgment action. In this respect it acted conformably with *Lumbermens Mut. Cas. Co.* v. *Belleville Indus., Inc.*, 407 Mass. 675, 685-686 (1990) (declaratory judgment an appropriate vehicle for determination of dispute over duty to defend).

Interpretation of policy language is a question of law for the court. See *Jet Line Servs., Inc.* v. *American Employers Ins. Co.*, 404 Mass. 706, 710 n.5 (1989). It is settled that if the allegations are reasonably susceptible of an interpretation that they state a claim covered by the policy, the insurer must undertake the defense. See, e.g., *Continental Cas. Co.* v. *Gilbane Bldg. Co.*, 391 Mass. 143, 146 (1984). When "the allegations lie expressly outside the policy coverage and its purpose," however, summary judgment for the insurance company is proper. See *Lusalon, Inc.* v. *Hartford Acc. & Indem. Co.*, 400 Mass. 767, 773 (1987), quoting from *Terrio* v. *McDonough*, 16 Mass. App. Ct. 163, 168 (1983).

The allegations in this case encompass a scenario expressly excluded from coverage. Although not the clause the motion judge relied on, we find section B(1)(n)(1), the "impaired property" exclusion, applicable to the claim here, and affirm on that basis. "It is well established that, on appeal, we may consider any ground apparent on the record that supports the result reached in the lower court." *Gabbidon* v. *King*, 414 Mass. 685, 686 (1993). We express no opinion about the applicability of any of the other exclusionary clauses in the policy.

The "impaired property" exclusion in Dorchester's policy states that coverage does not extend to "property damage" to "impaired property" arising out of a "defect, deficiency, inadequacy, or dangerous condition" in the insured's work. "Property damage" as defined in the policy includes loss of use, as occurred here. "Impaired property" is defined as property other than the insured's "work," that cannot be used or is less useful because it incorporates "defective, deficient, inadequate or dangerous" work, but which can be restored to

---

[3]The owners make no claim for bodily injury.

use simply by, for example, removing the offending work. The insured "work" is defined as "operations performed by" the insured. Thus, in the circumstances, the effect of the "impaired property" exclusion is to bar coverage for loss of use claims (1) when the loss was caused by the insured's faulty workmanship; and (2) when there has been no injury to the property aside from the incorporation of the insured's faulty work itself.

Discussed in some detail in *Standard Fire Ins. Co.* v. *Chester O'Donley & Assoc., Inc.*, 972 S.W.2d 1, 9-10 (Tenn. Ct. App. 1998), that court illustrated this exclusion — which featured policy language nearly identical to that featured here — by explaining how the loss of use of a building might be occasioned by the installation of a faulty heating system. Other cases implicating this exclusion have turned on the fact that the exclusion applies only if the damaged property can be restored to use by the "repair, replacement, adjustment or removal" of the insured's work. See, e.g., *Shade Foods* v. *Innovative Prods. Sales & Mktg.*, 78 Cal. App. 4th 847, 866-867 (2000) (exclusion does not apply where cereal nut clusters found to contain wood splinters unable to be restored to use).

In the case at bar, Dorchester has no duty to defend. The damage claimed by the owners came from the alleged dispersal of lead-based paint chips and dust. The painters are said to have failed to contain the toxins they set free through their scraping and sanding operations, certainly an inadequacy and a dangerous condition in their work. That faulty workmanship denied the owners the use of their house until it could be restored to use by the removal of the faulty element of the contractor's work, the errant chips and dust. There was no other damage to the property other than the contractor's work.

Our interpretation is consistent with the purpose of the insurance policy at issue. General liability coverage is not intended as a guarantee of the insured's work, and for that reason, general liability policies contain "business risk" exclusions. See *Sterilite Corp.* v. *Continental Cas. Co.*, 17 Mass. App. Ct. 316, 321-322 (1983). Such "business risks" have been described as those "which management can and should control or reduce to manageable proportions; risks which management cannot effectively avoid because of the nature of the business operations; and risks which relate to the repair or replacement of faulty work or products. These risks are a normal, foreseeable and expected incident of doing business and should be reflected in

the price of the product or service rather than as a cost of insurance to be shared by others." *Sterilite Corp.*, *supra* at 322 n.13, quoting from Tinker, Comprehensive General Liability Insurance — Perspective and Overview, 25 Fed'n Ins. Couns. Q. 217, 224 (1975). See Hendrick & Wiezel, The New Commercial General Liability Forms — An Introduction and Critique, 36 Fed'n Ins. Couns. Q. 314, 322 (1986) (business risk exclusions for "normal, frequent, or predictable consequences of doing business"). In the paint trade, scraping and sanding away old paint — which commonly contains lead — is de rigueur. The possibility that chips and dust may contaminate the surroundings is clearly a normal, foreseeable, and expected incident of doing business. This risk can and should be reduced to manageable proportions by prophylactic measures (such as drop cloths and closed windows and doors) and careful cleanup, but the possibility cannot be completely foreclosed because of the nature of the business. This is a classic business risk scenario, the cost of which is properly reflected in the price of the painting service. See *Sterilite Corp.* v. *Continental Cas. Co.*, *supra* at 322.

"We have considered [the appellant's] arguments about: the insurance buyer's reasonable expectations (see *Hazen Paper Co.* v. *United States Fid. & Guar. Co.*, 407 Mass. 689, 700 [1990]); construing the policy strictly against the insurer (see *Camp Dresser & McKee, Inc.* v. *Home Ins. Co.*, 30 Mass. App. Ct. 318, 323-324 [1991]); and resolution of ambiguities against the insurer (*Ibid*). None alters the conclusion that a reasonably informed [policyholder] would not expect or, from the language of the policy, conclude that the policy insured against" failure to contain the paint chips and dust created by scraping and sanding activities. See *Spencer Press, Inc.* v. *Utica Mut. Ins. Co.*, 42 Mass. App. Ct. 631, 634-635 (1997). Cf. *Bond Bros., Inc.* v. *Robinson*, 393 Mass. 546, 552 (1984) (nothing to lead an insured reasonably to expect coverage for damage caused by poor workmanship).

Finally, the contractor and the owners argue that the declaratory judgment action was premature, as no case had yet been filed by the owners against the contractor and the allegations made neither have been stipulated to nor judicially determined. We overlook the fact that this argument is raised for the first time on appeal and the lack of a single citation to authority, to clarify that insurers in doubt about whether a duty to defend ex-

ists are encouraged to seek declaratory relief. See *Lumbermens Mut. Cas. Co. v. Belleville Indus., Inc.*, 407 Mass. at 685-686.[4] As we have stated, the case law does not compel insurers to defend claims as a prerequisite to determining whether they have a duty to defend.

*Judgment affirmed.*

---

[4]Of course, our decision that the insurer has no duty to defend in these circumstances does not foreclose such a duty if the facts of the underlying claim change. See *Lumbermens Mut. Cas. Co. v. Belleville Indus., Inc.*, 407 Mass. 675, 686 (1990).