Connolly, J.
INTRODUCTION
This declaratoiy judgment action was brought by Metallized Products, Inc. (MPI) against its insurer, Lumbermens Mutual Casualty Company (“Lumbermens”) seeking a judicial determination that Lumbermens was liable for MPI’s costs of defense and its cost of $600,000.00 to settle an underlying case. In this motion for partial summary judgment, MPI seeks a determination and declaration that Lumbermens owed MPI a duty to defend it in an underlying products liability claim, that Lumbermens breached its duty to defend MPI, and is liable for the defense costs incurred by it in the underlying case, and further that MPI be awarded its attorney fees incurred in establishing Lumbermens duty to defend in this case, together with applicable interest. See: Hanover Ins. Co. v. Golden, 436 Mass. 584 (2002). The defendant, Lumbermens has filed a cross motion for summary judgment on all issues alleging that the underlying complaint and claim is excluded from coverage. [1]
While the facts in this case may be rather complicated, the law and its application to the facts is fairly simple and straightforward. This is, at this stage, a dispute over whether Lumbermens owed the duly to defend the plaintiff, MPI in a products liability case brought by Excello Specialty Corp. (“XLO”).[2] Lumbermens, in turn, has filed a cross motion for summary judgment alleging that it had no duty to defend or to indemnify MPI in the underlying case.
The underlying case in Ohio arose out of a component of a product, processed in part by MPI, and shipped on to another corporation for further processing, and then on to the automobile manufacturer for installation as a “water shield” in an automobile under construction.
The process of manufacturing water shields is fairly complicated and is briefly summarized as follows:
1. A company called Blaco prepares rolls of metal-lized film and then ships them to MPI.
2. MPI receives the rolls of metallized film, cuts it into smaller sizes, starts the film through their process and applies clear silicone (cannot be seen with the naked eye) to one side of the metallized film. (It is not necessary at this time to go further *774 into this complicated process for purposes of this motion).
3. The metallized film then goes back to Blaco after the silicone is applied. Blaco then cuts the film rolls into generic shapes and sizes. They are then shipped to XLO.
4. XLO cuts the water shields to the exact size as specified by their customer (auto manufacturer).
5. XLO then places the water shields on a vacuum board, silicone side down, and a bead of adhesive is applied to the dry side (non-silicone) of the water shield. This adhesive is formally called “a hot melt pressure sensitive adhesive.” The two water shields should easily separate during the unpacking process (by the auto manufacturer) because the adhesive beaded dry side of one water shield easily releases from the silicone-cured side of the neighboring water shield. The product was then shipped to the auto manufacturer.
6. The auto manufacturer separates the water shields and applies the adhesive-beaded diy side of the water shield to the door, the adhesive holding the shield in place and forming a proper seal.
In early June of 2001, XLO informed MPI that one of its customers, Chrysler Corporation, had reported failures involving automobiles that contained XLO manufactured water shields known formally as an inner door water deflector. Excello began independent diagnostic testing, which revealed the presence of improperly cured silicone on the surface of the poly-ethethyle. The water shields, after being placed in the automobile door, were failing because the bead of adhesive was separating from the water shield in certain areas. In other words the water shields were not bonding properly in all the places it was designed to shield.
XLO performed tests at Blaco and MPI to determine what was causing this problem. It was determined that the silicone being applied was not completely cured on the metallized film. The uncured silicone around the edges of the metallized side was mobile. Tests confirmed that the temperature, humidity and presence of oxygen in the chamber played a role in the silicone not curing properly. MPI made the appropriate adjustments and increased the levels of nitrogen in the chamber. The silicone was determined to be properly cured on the metallized film on June 29, 2001.
The uncured silicone was on the area along the perimeter of the water shield. When the shield was handled by MPI, Blaco and XLO, the uncured silicone was spread to the dry side of the water shield. The uncured silicone was transferred to the area along the perimeter of the dry side of the water shield, where the bead of adhesive was later applied. The bead of adhesive applied by XLO could not properly adhere to the uncured silicone on the dry side of the water shield. When Chrysler inserted the water shield into the automobile doors, the adhesive separated from the water shield where the uncured silicone had transferred to the dry side. Complaints were made by Chrysler around June 2001 that its inner door water deflectors were experiencing catastrophic failures due to the debonding of the inner door water deflectors.
The underlying civil action was commenced on March 1, 2002, and was served on MPI. MPI tendered the defense to Lumbermens, for purpose of defending and indemnifying MPI. Lumbermens promptly responded by a six-page letter, dated March 18, 2002 denying any duty to defend or to indemnify MPI under the applicable provisions of the Lumbermens policy. James Gagnon, Branch Claims Manager, indicated in said letter that “(a) review of the Excello complaint and the applicable provisions of the LMC [Lumbermens] policy demonstrates that there are no allegations creating even a potential for coverage for property damage.”
The plaintiff, MPI, hired private counsel to represent it in the Ohio case, and eventually settled the case for $600,000. MPI has brought this civil action against Lumbermens seeking the $600,000 paid to “XLO” and the legal costs paid to defend itself. This motion for partial summary judgment is brought by MPI solely to establish Lumbermens duty to defend MPI in the underlying action, for its costs of its defense of the Ohio case, and its attorneys fees in prosecuting this civil action to date.
DISCUSSION
Here the plaintiff, MPI, must establish as a matter of law, based on the allegations and facts contained in the underlying complaint, and the fair inferences to be drawn from said facts, that there was, at a minimum, a possibility that one or more in part or in all, of the claims asserted in the complaint in the underlying case did or may fall within the insurance coverage. (Emphasis added.) Sterilite Corp. v. Continental Casualty Company, 17 Mass.App.Ct. 316, 319 (1983).
Under Massachusetts law, an insurer has a duty to defend its insured, which duty is more expansive than its duty to indemnify. The duty to defend is antecedent to, and independent of the duty to indemnify. The obligation of the insurer is not determined by reference to the facts proven at trial. Rather the duty to defend is based on the facts alleged in the complaint and those facts which are known by the insurer. Boston Symphony Orchestra v. Commercial Union Ins. Co., 406 Mass. 7, 10-11 (1989).
The test for determining whether an insurer has a duty to defend is well-established. “Whether there is such a duty is decided by: matching the complaint with the policy provisions, if the allegations of the complaint are reasonably susceptible of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must undertake the defense ...” Millipore Corp. v. Travelers Insurance Indem., 115 F.3d 21 (1st Cir., 1997) (quoting Sterilite *775 Corp. v. Continental Casualty Company, 17 Mass.App.Ct. 316, 318 (1983)). “Otherwise stated, the process is one of envisaging what kind of losses may be proved as lying within the range of the allegations of the Complaint, [and those facts which are known by the insurer] and then seeing whether any such loss fits the expectation of protected insurance reasonably generated by the terms of the policy.” Sterilite Corp. v. Continental Casualty Company, 17 Mass.App.Ct. 316, 318 (1983). In making a determination as to an insurer’s duly to defend, outside information may be used to bring the claim within the coverage of the policy. Boston Symphony Orchestra v. Commercial Union, 406 Mass. 7, 10-11 (1989); Swift v. Fitchburg Mut. Ins. Co., 45 Mass.App.Ct. 617, 623 (1998). However, information derived from outside the complaint may not serve to negate the duiy to defend. Millipore Corp. v. Travellers, 115 F.3d 21, 35-36 (1st Cir., 1997). For purposes of these cross motions, the Court has only considered the allegations and facts, and the fair inferences to be drawn from said facts, as set out in the complaint in the underlying case.
The defendant, Lumbermens, could have filed a complaint for Declaratoiy Relief to determine whether or not there was coverage afforded to MPI on the underlying claim. This of course, would have required Lumbermens to defend under a reservation of rights or under some other arrangement agreed to by the insured. This method would have protected its insured. This Lumbermens refused to do. Lumbermens basically just unilaterally determined that there was no coverage, wrote, some seventeen days after its insured was served, a letter to the insured, MPI, informing it of Lumbermens decision and thereupon washed its hands of the entire case. Sterilite Corp., supra at 323. “What is not permitted is that an insurer shall escape its duiy to defend the insured against a liability arising on the face of the complaint and policy by dint of its own assertion that there is no coverage in fact, the insurer then stands in its breach even if the third party fails in the end to support any such claim of liability by adequate proof.” Sterilite Corp., supra, p. 324.
The defendant, Lumbermens, issued a commercial general liability policy (“CGL policy”) to the plaintiff, MPI, that was effective from 5/22/01 to 5/22/02. Under said policy, Lumbermens was obligated to defend MPI with respect to lawsuits alleging damages because of property damage caused by an occurrence during the policy period. Specifically, the policy provides: “We will pay those sums that the insured becomes legally obligated to pay as damages because of . .. properly damage” to which this insurance applies. The insurance covered property damage only if (1) the property damage is caused by an occurrence and (2) the property damage occurs during the policy period. An occurrence means an accident, including continuous or repeated exposure to substantially the same harmful conditions. Property damage means (1) physical injuiy to tangible property, including all resulting loss of use of that property and (2) loss of use of tangible property.
The Complaint in the underlying Ohio case involves a section of facts common to all counts, and six separate counts as follows:
Count I — -breach of implied warranties
Count II — breach of express warranties
Count III — negligent design or manufacture
Count IV — breach of contract
Count V — negligent production of polyethylene film by MPI
Count VI — defective nature of polyethylene film in its manufacture, design, formulation and defective due to inadequate instructions and warnings.
The defendant’s position is that there is no coverage afforded by Lumbermens because MPI’s action and conduct involve no more than poor or defective workmanship and a defectively processed product. Lumbermens asserts that MPI only was responsible for the failure to provide an acceptable work product and that MPI assumed the risk of failing to manufacture the item in a workmanlike manner and to provide an acceptable end product. Repairing or replacing faulty products is a business expense, ordinarily to be borne by the insured contractor in order to satisfy customers. See Weldo v. Stone-E-Brick, Inc., 81 N.J. 233, 239-40 (1979); Commerce Insurance Co. v. Betty Caplette Builders, Inc., 420 Mass. 87 (1995).
This issue is dealt with by Professor Roger C. Henderson’s in his frequently cited article[3] as follows on page 441:
The risk to be insured is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause damage to property other than the product or completed work itself, and for which the insured may be found liable.
Lumbermens basic defense to the claim of a duty to defend is that this/these claims by XLO are excluded by the so-called “Business Risk Exclusions.” Specifically, it is urged by Lumberman’s that MPI created, in part, the product that was defective and MPI’s product simply did not “meet the level of performance, quality, fitness or durability warranted or represented by the named insured.” Sterilite Corp., supra at 321. However, as succinctly stated by the Court in Wedo v. Stone-E-Brick, Inc., 81 N.J. 233, 405 A.2d 788, 796 (1979), “[t]he policy in question does not cover the accident of faulty workmanship, but rather faulty workmanship which causes an accident.”
To properly decide this issue, a discussion of what is and is not covered in a case of property damage under a CGL policy is in order. The policy does not cover an insured for its goods, products or work which *776 were improperly made or done and which do not cause property damage. That is a loss that is expected to be borne by MPI as a business expense and is a loss that falls under the business risk exclusions. However, when the insured’s product or work done by it causes property damage, there is coverage under the CGL. Therefore the question becomes whether the complaint alleges that the insured, MPI’s product caused property damage to another’s property, and if so there would be a duty to defend for one or more claims, in part or in all, for the damages claimed by XLO.
The allegations in the XLO complaint describes damage to automobiles caused by water leaks, contamination of downstream manufacturing processes, labor charges back to XLO from XLO’s customers, the auto manufacturers, and damage to XLO’s business, including good will, loss of customer confidence, loss of fixture business, loss of business expectations and business interruption costs. The XLO complaint alleges that it “received complaints from its automobile manufacturer customers that its inner door water deflectors were experiencing catastrophic failure attributable to sporadic PSA debonding and that resulting injuries suffered by XLO included ’’significant expenses including customer rework."
From these allegations in the underlying case, this Court concludes that the only reasonable inference to be drawn is that, in part, the claim is arising out of the defective water shields (i.e., the inner door water deflectors) which damaged property that was not processed or manufactured by MPI (i.e., Chiysler’s automobiles). As stated in Sterilite Corp., supra, 318, one must match the Complaint with the policy provisions. “(I]f the allegations are reasonably susceptible of an interpretation that they state or adumbrate a claim covered under the policy terms, the insurer must undertake the defense.” The insurer must envisage what kind of losses may be proved as lying within the range of the allegations of the Complaint, and then seeing whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy." Sterilite Corp., supra at 318.
This Court can not construe the facts contained in the Complaint in any way that does not present, inter alia, a claim for damages to property, in addition to the item processed or manufactured by MPI. To claim that it does not seems to this Court to be patently absurd. “In order for the duly of defense to arise, the underlying complaint need only show, through general allegations, a possibility that the liability claim falls within the insurance coverage. There is no requirement that the facts alleged in the complaint specifically and unequivocally make out a claim within the coverage." Sterilite Corp., supra at 319 (emphasis added).
The exclusions to coverage cited by the defendant, Lumbermens, in its (a) Memorandum in Support of Lumbermens Opposition to the Plaintiffs Motion for Partial Summary Judgment and Lumbermens Cross Motion for Summary Judgment and (b) Lumbermens Reply Brief have been adequately covered by counsel for MPI in its (1) Memorandum in Support of Plaintiff, MPI’s Motion for Partial Summary Judgment on the Duty to Defend, (2) MPI’s Memorandum of Law in Opposition to Lumbermens Cross Motion for Summary Judgment and (3) Surreply of the Plaintiff MPI to the Defendant Lumbermens Reply Brief to the Plaintiffs Opposition to Cross Motion for Summary Judgment. The exclusions relied on are J(4), J(6), K, L, M and N. The Court adopts the argument contained in MPI’s Memoranda.[4]
Finally, there is a cross motion for summary judgment by Lumbermens. On the plaintiffs Motion for Partial Summary Judgment on the Duty to Defend, the plaintiff need only prove that Lumbermens owed it the duly to defend MPI on any claim or part of any claim or “a possibility that the liability claim falls within an insurance coverage.” If that is shown, Lumbermens owed the duty to defend the entire claim (covered and uncovered claims). Under Massachusetts law, if an insurer has a duty to defend one count of a complaint, it must defend all the counts. Mt. Airy Insurance Co. v. Greebaw, 127 F.3d 15 (1st Cir., 1997); Aetna Casualty & Surety Co. v. Continental Casualty Co., 413 Mass. 730, 732, n.1 (1992), and Palermo v. Fireman’s Fund Insurance Co., 42 Mass.App.Ct. 283, 289-90 (1997).
The Cross Motion for summary judgment on the Duly to Defend by the defendant, Lumbermens, will fail if MPI can prove that Lumbermens owed MPI a duty to defend on one or more, or part of one or more claims brought by XLO. The Court will decline to act on Lumbermens Duly to Indemnify, and will reserve same to the trial judge to decide same after the trial of this case. This Court, therefore, rules as a matter of law that Lumbermens owed the duty to defend MPI in the underlying Ohio case.

ORDER

The Motion of MPI for Partial Summary Judgment on the Duty to Defend is ALLOWED. It is Ordered and Declared that Lumbermens Mutual Casualty Insurance Company had the duty to defend MPI in the underlying case in Ohio, and Lumbermens is ordered to pay MPI’s costs of defense in said underlying case, and the costs of prosecuting this case to this stage in the proceedings.
The Motion of Lumbermens for Summary Judgment on the duty to defend MPI is DENIED. The Court declines to act on that portion of Lumbermens Motion dealing with the duty to indemnify, and refers same to the trial judge after the evidence in this case has been presented at trial. See Sterilite Corp., supra at p. 323, n.15.

Travelers Insurance Company, whose applicable insurance policy expired on May 22, 2001, settled the claim against it by MPI, and has been dismissed out of the case.

Excello Specialty Corp. v. Metallized Products, Inc., Civil Action No. 463937, in the Court of Common Pleas, Cuyahoga County, Ohio.

Roger C. Henderson, Insurance Protection for Products Liability and Completed Operations — What Every Lawyer Should Know, 50 Neb.L.Rev. 415 (1971).

Exclusion M deals with damage to “impaired properly.” This exclusion is discussed in detail in Dorchester Mut. Fire Ins. Co. v. First Kostas Corp., Inc., 49 Mass.App.Ct. 651, 653-54 (2000).
The “impaired property” exclusion in Dorchester’s policy stated that the coverage does not extend to property damage to “impaired property” arising out of a “defect deficiency, inadequacy, or dangerous condition” in the insured’s “work.” “Impaired property” is defined as property other than the insured’s work that cannot be used or is less useful because it incorporates “defective, deficient inadequate or dangerous work, but which can be restored to use simply by, for example, removing the offending work . . . [T]he effect of the impaired property exclusion is to bar coverage for loss of use claims (1) when the loss was caused by the insured faulty workmanship: and (2) when there has been no injury to the property aside from the incorporation of the insured’s faulty work itself.” Here, in this case there has been significant property damage to the automobiles being manufactured or which had been manufactured. Accordingly section (2) above would not allow any “impaired property” exclusion to be applicable under the facts of this case.